**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**CHERYL R. JORDAN,**

      **Plaintiff,**

      **v.**                      **Case No. 2:22-cv-167**

**SCHOOL BOARD OF**
**THE CITY OF NORFOLK,**
**d/b/a NORFOLK PUBLIC SCHOOLS,**

      **Defendant.**

**MEMORANDUM IN SUPPORT OF THE DEFENDANT'S**
**MOTION IN LIMINE REGARDING MEDICAL EXPERTS**

**COMES NOW** the Defendant, the School Board for the City of Norfolk ("School Board" or "Defendant"), by counsel, and pursuant to Rule 702 of the Federal Rules of Evidence, hereby files its Memorandum in Support of its Motion in Limine Regarding Medical Experts.

**OVERVIEW**

Cheryl R. Jordan ("Plaintiff" or "Jordan") identified five expert witnesses in her Rule 26(a)(2)(C) expert disclosure on June 12, 2023: (1) Timothy S. Fusiak, DO; (2) Paul Wenzel, M.D.; (3) allergist Dr. Craig Koenig; (4) Deborah Mostert, LPC; and (5) Stephen Cunningham, MD. The opinions of these doctors should be excluded under Rule 702 and the *Daubert* standard because, among other reasons, they are not reliable, not based on facts, and are not within the scope of their respective qualifications and experience.

## ARGUMENT

### I.    Jordan's expert disclosure was untimely and incomplete

As a preliminary matter, Jordan's disclosure of her proposed experts was untimely. Paragraph 2 of the Court's Rule 16(b) Order states that the "party having the burden of proof upon the primary issue to which potential Rule 702, 703 or 705 evidence is directed shall identify expert witnesses to be proffered upon such an issue by name, residence and business address, occupation and field of expertise on May 12, 2023." The Order further specifies that the "disclosure outline in Rule 26(a)(2)(B) shall be made on June 12, 2023."

Jordan did not provide any expert disclosure until June 12, 2023. She did not identify her proposed experts by May 12, 2023, in accordance with the Rule 16(b) Order. See Jordan Expert Disclosure attached as "Exhibit 1." She did not provide her proposed experts' residential address, occupation and field of expertise by May 12, 2023, and her June 12th disclosure did not include that required data either. In addition, Jordan testified at her deposition that Dr. Fusiak is no longer associated with the practice listed on her disclosure (Sentara Pulmonary, Critical Care and Sleep Specialists), and she has not provided either Dr. Fusiak's current business or residence address (as required by the Rule 16(b) Order) or the name and address of her new doctor at that practice. Pl. Dep. 30:4-14.

### II.    Jordan's proposed experts do not satisfy Rule 702

### A.    The legal standard for admissibility of expert medical testimony

Rule 702 of the Federal Rules of Evidence sets the standard for the admissibility of expert testimony, and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court recognized the important role of trial judges as "gatekeepers" to exclude evidence that does not meet this standard; "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 597 (1993). "Proposed [expert] testimony must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known." *Id*. at 590. "An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id*. at 591 (citation and quotation marks omitted). Rule 702 and *Daubert* "require[] a valid ... connection to the pertinent inquiry as a precondition to admissibility," and "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (citation and quotation marks omitted). The proponent of the testimony must establish its reliability, and therefore its admissibility, by a preponderance of proof. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

In summary,

Expert testimony is admissible under Rule 702, then, if it concerns (1) scientific, technical, or other specialized knowledge that (2) will aid the jury or other trier of fact to understand or resolve a fact at issue. The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to render it trustworthy. The second prong of the inquiry

requires an analysis of whether the opinion is relevant to the facts at issue. *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999) (citing *Daubert*).

Proposed medical experts, including treating physicians, are subject to the standards of Rule 702 and *Daubert*. *See, e.g.*, *Perkins v. United States*, 626 F. Supp. 2d 587, 592 (E.D. Va. 2009); *Fantauzzo v. Sperry*, No. 2:21-CV-4, 2021 WL 5236490, at *8 (E.D. Va. Nov. 10, 2021), *objections overruled,* No. 2:21CV4 (RCY), 2022 WL 1524990 (E.D. Va. May 13, 2022). Testimony of a medical expert is properly excluded if his or her testimony is not reliable. *See Perkins*, 626 F. Supp. 2d at 595.

This Court has identified several factors that demonstrate when medical testimony is not reliable. First, "exclusive reliance on a patient's self-report" renders a medical opinion unreliable, and courts have rejected medical testimony when the doctor "simply took [a p]laintiff's word for what happened and adopted that explanation as his own opinion on causation." *Id*. at 592 – 593. The corollary is that a medical opinion is more reliable when the "physician considered many factors beyond [the plaintiff's] report." *Fantauzzo*, No. 2:21-CV-4, 2021 WL 5236490, at *8. Second, medical testimony is unreliable when the doctor "did not adequately investigate [the plaintiff's] relevant medical history" and lacked the information needed to make a reliable differential diagnosis. *Perkins*, 626 F. Supp. 2d at 593 ("By taking Perkins' self-report at face value, and not developing an accurate medical history for his patient, Dr. Wardell neither knew nor considered Perkins' history of prior trauma and injury."). Third, medical testimony is unreliable when the medical provider "failed to consider alternative explanations . . . . '[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony.'" *Perkins*, 626 F. Supp. 2d at 594 (quoting *Cooper*, 259 F.3d at 202).

In addition, medical testimony is not reliable, and should be excluded, when it concerns matters outside the scope of the medical provider's experience and expertise. See, e.g., *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 607 (S.D. W.Va. 2013), *on reconsideration in part* (June 14, 2013) ("Dr. Altenhofen seeks to opine on the adequacy of Bard's IFUs and training, as well as Bard's sales representative's statements regarding the erosion rate and other complications, pain, and reoperation rates. However, he is simply not qualified to render opinions on the adequacy of warnings, as he has no 'knowledge, skill, experience, training, or education' in this particular area."); *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 427–28 (6th Cir. 2009) (concluding that although a "medical doctor is generally competent to testify regarding matters within his or her own professional experience," when "the doctor strays from such professional knowledge, his or her testimony becomes less reliable, and more likely to be excluded under Rule 702").

Under Virginia law, the courts require documentation in the medical record for testimony proffered, and require that any opinions be expressed to  a reasonable degree of medical probability. *Pettus v. Gottfried,* 606 S.E.2d 819, 824 (Va. 2005) (*citing* Va. Code § 8.01-399(B)). Section 8.01-399(B) of the Virginia Code states in relevant part:

> If the physical or mental condition of the patient is at issue in a civil action, the diagnoses, signs and symptoms, observations, evaluations, histories, or treatment plan of the practitioner, obtained or formulated as contemporaneously documented during the course of the practitioner's treatment, together with the facts communicated to, or otherwise learned by, such practitioner in connection with such attendance, examination or treatment shall be disclosed but only in discovery pursuant to the Rules of Court or through testimony at the trial of the action . . . .

Only a diagnosis offered to a reasonable degree of medical probability shall be admissible at trial. Va. Code § 8.01-399(B).

Under these standards and factors, the testimony of each of Jordan's proposed experts should be excluded in whole or in part, as detailed below. In sum, all of the medical providers' opinions about Jordan's exposures to mold, rodents,  dust, and other conditions at the school buildings, and their opinions that her health conditions are being caused by the school buildings, are based solely on Jordan's self-reports. Her doctors' opinions lack objective evidence and any or substantial information about her prior medical history and concurrent medical treatment from other providers. Moreover, some providers' opinions exceed the scope of testimony allowed by treating providers under Virginia Code § 8.01-399 and should be excluded on that basis as well.

### B.    Dr. Fusiak

Jordan's expert disclosure states that she began treatment with Dr. Fusiak in October 2020, and that his testimony includes that "Jordan advised [him] that she was exposed to dust, mold, fiberglass and rats at her place of employment," and he "highly suspected the increase in issues with Jordan's asthma was due to 'sick building syndrome.'" Ex. 1, p. 2. He noted that "there are likely exposures at work contributing to severity of symptoms," and opined that Jordan's "asthma symptoms worsened at work and improved when she was not at work." *Id.*

As an initial matter, the opinions of Dr. Fusiak and Dr. Koenig regarding "sick building syndrome" should be excluded, as they are not relevant to the issues remaining in the case. Judge Smith's Opinion noted that Jordan's alleged physical impairments for which she sought reasonable accommodations under the ADA are restrictive lung disease and asthma. ECF No. 13, p. 15. This is the law of the case, which "provides that a prior decision should be binding upon subsequent stages in the litigation between the parties." *Vortekx, Inc. v. IAS Communications, Inc.*, 72 F. Supp. 2d 638, 640 (N.D. W.Va. 1999). Sick building syndrome is not a condition for which Jordan allegedly sought accommodations under the ADA, and is therefore irrelevant.

Dr. Fusiak testified at his deposition in Jordan's workers' compensation case that his opinions are based on Jordan's self-reports, and he acknowledged that he lacked significant data points, such as when and where Jordan was working. Dr. Fusiak explained that Jordan's "rat exposure was in the past" and "at a limited point in time as opposed to continuous over multiple years," but he did not know when that occurred or when it was remediated. Dr. Fusiak July 13, 2022 Deposition Transcript, excerpts attached as "Exhibit 2," 43:13-20, 44:8-19. Dr. Fusiak acknowledged that, although he believes Jordan has sick building syndrome, he does not know the cause of that syndrome for her; "[i]t could have been any of the exposures that she had or that she reported or even something that she could not precisely identify." *Id.* at 49:2 to 50:5. He first considered sick building syndrome in October 2020, but he does not know how often Jordan was in the school building during that time, or even how many years she had worked at Sherwood Forest. *Id.* at 29:3 to 30:9, 34:9-17, 49:2-16. Dr. Fusiak was unaware of the extensive, six-figure remediation of Sherwood undertaken by Acme in the Fall of 2019, and he was "unaware of the multiple instances of environmental testing and sanitization" in Sherwood Forest at that time. Ex. 2, at 33:8-13, 39:25 to 40:7.

A medical expert's opinion that a patient suffers a condition due to exposure to a substance or environment is not admissible when the expert does not know the quantity or duration of the exposure. *See, e.g., Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 198 (4th Cir. 2013) (affirming the exclusion of a proposed expert's opinion as unreliable, because the expert "could not even identify the intensity and duration of [the plaintiff's] exposure"). Jordan's expert disclosure reflects the uncertainty in Dr. Fusiak's opinion, stating that he "highly suspected the increase in issues with Jordan's asthma was due to 'sick building syndrome.'" Ex. 1, p. 2. "Highly suspect[ing]"

something is a cause is not the requisite degree of specificity for medical opinions, nor are opinions regarding "likely exposures."

Dr. Fusiak acknowledged that he did not know if there was mold in the school, or what type of mold she might have been exposed to; his information was based on what Jordan reported to him and that she believed there was mold. Ex. 2, at 38:25 to 39:16, 40:11-19. Repeated air quality testing from an independent laboratory confirmed that there was no mold in Sherwood Forest that negatively affected the indoor environment, but Dr. Fusiak did not consider this data that contradicted Jordan's self-reports. Dr. Fusiak did not know anything about potential dust exposures other than what Jordan reported to him. *Id*. p. 79:15 to 80:5. To the extent Dr. Fusiak considered the symptoms of other people in the building in his sick building syndrome diagnosis, he only knew what Jordan told him about others. *Id*. at 50:6-23. Dr. Fusiak still could not identify the cause for his sick building syndrome diagnosis in September 2021, and did not even know that Jordan was reassigned to a different school by that time. *Id*. at p. 67:9 to 68:24. Dr. Fusiak also did not receive any records of treatment with Jordan's primary care provider. *Id*. at 14:22 to 15:1.

Like Dr. Koenig, detailed below, Dr. Fusiak also went beyond the scope of his expertise, and the scope of Va. Code § 8.01-399, to offer speculative opinions about air quality testing at Sherwood Forest and Richard Bowling. Those opinions were not formed during and for the purpose of Jordan's treatment, but rather to support her workers' compensation claim. Opinions beyond the scope of a doctor's treatment should be excluded, as should opinions that are not based on observations during the course of treatment but rather based on later sources provided by a plaintiff's attorney. See Virginia Code § 8.01-399; *Fantauzzo*, No. 2:21-CV-4, 2021 WL 5236490, at *5-*6 (noting that the "admissibility of a treating physician's causation opinions therefore depends on whether the physician based the opinion on 'his or her treatment' of the injured party,"

and that "if a treating physician bases his or her 'medical opinion ... on factors that were not learned in the course of the treatment of the patient, then such a doctor would be required to present an expert report'").

Dr. Fusiak completed a July 10, 2022 questionnaire concurring with Dr. Koenig's assessment of the environmental testing reports in Dr. Koenig's May 31, 2022 letter, but Dr. Fusiak acknowledged during his deposition that he also lacks the qualifications to critique or interpret such reports, as he is not a certified mold inspector and assessor, is not an industrial hygienist, and does not know the industry standards for mold and air quality testing. Dr. Fusiak July 10, 2022 Questionnaire Response, attached as part of Exhibit 2; Ex. 2 at 9:13 to 10:7, 90:20 to 91:10, 92:1-16. Dr. Koenig's May 31, 2022 letter also discusses the spore counts for Aspergillus, a type of mold, and his belief that Jordan "would be unusually susceptible" to exposure to that mold. See May 31, 2022 letter attached as part of Exhibit 4 below. Although Dr. Fusiak "concur[red] with Dr. Koenig's assessment" of the environmental testing, at Dr. Fusiak's deposition, he acknowledged that Jordan's 2019 allergy testing showed she was not allergic to Aspergillus and that he did not know what type of molds he believed Jordan was exposed to. Ex. 2, at 45:22 to 47:5.

These opinions are unreliable and are outside Dr. Fusiak's qualifications, and should be excluded. *See Zellers v. NexTech Ne., LLC*, 533 F. App'x 192, 197 (4th Cir. 2013) (excluding testimony from a neurologist about allegedly toxic exposure to refrigerant, noting "*Daubert*'s command that an expert's testimony must be based on 'more than subjective belief or unsupported speculation,'" and concluding that "[b]ecause [the proposed expert] lacks specific training in the field in which she seeks to testify, and because she was unable to state with specificity that any of Ms. Zellars's alleged injuries were caused by exposure to refrigerant gas, Dr. Sharma simply

cannot overcome this hurdle."). Dr. Fusiak is a pulmonologist, not an allergist or an industrial

hygienist. He is not qualified to offer the opinions identified above. Ex. 2, at 9:13-24, 88:1-22.

Dr. Fusiak's opinions are not reliable and should be excluded, because they are based only

on reports of Jordan, and scientific evidence contradicts her statements to the doctors about the

environmental conditions at Sherwood Forest and Lindenwood, such as the presence and impact

of mold on the indoor environment. Dr. Fusiak did not have the information presented in the air

quality testing reports, was not aware of the various remediation efforts undertaken in the school

building, and he was not aware of the timelines of Jordan's claimed exposures or when she was

working in Sherwood Forest. Dr. Fusiak also lacked information about Jordan's prior medical

history and concurrent medical treatment from other providers.

### C.     Dr. Wenzel

Dr. Wenzel is Jordan's primary care doctor, and her expert disclosure states that she

"discussed her increased problems with her asthma and her work conditions," and advised him

that Dr. Koenig was treating her for "problems relating to her asthma." Ex. 1, p. 2. Dr. Wenzel

diagnosed Jordan with "major depressive disorder" in March 2020 and "referred her to see a

psychiatrist." The disclosure states he "concurred with the diagnosis of sick building syndrome,"

and that "Jordan continues to see Dr. Wenzel concerning chest tightness, insomnia, anxiety and

asthma issues." *Id*.

Dr. Wenzel was not previously deposed in the workers' compensation case. Nonetheless,

his records reflect that any opinion he developed was based solely on Jordan's self-reports to him.

For example, on September 22, 2020, Dr. Wenzel's notes record that Jordan "feels she is allergic

to mold, rats, and feces that were found in ceiling areas of school." See excerpts of Dr. Wenzel

treatment records attached as "Exhibit 3." On December 7, 2020, he noted that Jordan "may need

help with legal concerns as feels like has to keep her job," and that she "feels like exposed to environmental hazards on her job. Feels not being listened to." On June 23, 2021, Dr. Wenzel noted that Jordan "[o]nly needed two breathing treatments in last week," and his letter on the same date stated she could return to work on June 26. Dr. Wenzel has treated Jordan for a variety of medical problems, including diabetes, hypertension, and high cholesterol, which are not at issue in this case, and which have not been accounted for in any differential diagnosis of Jordan's depression and respiratory issues.

Finally, Dr. Wenzel's ongoing treatment for "chest tightness, insomnia, anxiety and asthma issues" is not relevant to any remaining issues in this case. Jordan has not worked inside an NPS building since August 2021, so any ongoing respiratory issues are not related to the alleged exposures in the school buildings. Dr. Wenzel is not treating Jordan for mental health issues for the mental health issues identified in the Amended Complaint and Judge Smith's Opinion, namely PTSD. ECF No. 7, ¶29; ECF. No. 13, p. 24.

Dr. Wenzel's proposed testimony about Jordan's work conditions and concurring opinions about sick building syndrome should be excluded as unreliable, since it is based solely on her self-reports. Concurring opinions are cumulative and his other treatment and diagnoses are not relevant in the current posture of the case.

### D.    Dr. Craig Koenig

Jordan's disclosure states that Dr. Koenig is her "treating doctor for occupational asthma and sick building syndrome," and that he "diagnosed her with sick building syndrome in September 2019 based on a compilation of symptoms caused by her employment." Ex. 1, p. 3. The disclosure also mentions Dr. Koenig's opinions in two letters. In a July 13, 2021 letter, he opined that Sherwood Forest Elementary was "'contributing exorbitantly to [Jordan's] lack of asthma

control,' and requested that Jordan be moved to a different school."[1] A May 31, 2022 letter contained his "synopsis of his evaluation of the mold analysis conducted by Applied Lab Services at Sherwood Forest and Lindenwood," and his belief that "Jordan having to experience such a chronic illness, that she has developed significant issues with anxiety and depression." *Id.*

Dr. Koenig was deposed and testified that, although he noted a "history of reported mold exposure at work," that was based on what Jordan told him; he had no "details" about her purported exposure to mold, other than "she believed there was mold," and he confirmed that he did not know for a fact that there was mold or what type of mold if there was any. Transcript of Dr. Koenig's June 28, 2022 Deposition, excerpts attached as "Exhibit 4," at 25:3-18. He likewise did not know what sort of exposure Jordan had to rodents, or rat feces and urine, but only that there was exposure "based on what she told me."[2] Ex. 4, at 39:25 to 40:7. Dr. Koenig did not know the onset of Jordan's exposure to rats, and did not know if exterminators came to Sherwood to correct the issue with rats. *Id.* at 45:3 to 47:5. Nonetheless, it was his opinion that the cause of Jordan's purported respiratory issues was "mold and potentially rodent issues at her school repetitively have triggered her asthma," and that diagnosis was "based on a presumed or assumed mold exposure" and "assumed rat exposure or mice rodent exposure" "based on what she [Jordan] was telling [him]." *Id.* at 56:8 to 57:11.

---

[1] Interestingly, Jordan had not been in the Sherwood Forest building for the majority of the year before this letter was authored.

[2] It does not appear that any of Jordan's doctors have claimed a causal link between her respiratory issues and exposure to fiberglass, but to the extent such a claim remains at issue, there is similarly a lack of evidence to support such a causal connection by clear and convincing evidence. For instance, Dr. Fusiak testified that he "just had her [Jordan's] report that she believed there was fiberglass coming from the ceiling." Ex. 2, at 42:8-10. Dr. Koenig likewise acknowledged he did not know if Jordan was exposed to fiberglass. Ex. 4, at 68:21-24.

Later, in September 2020, Jordan reported mold, rat feces, and urine in the school building, but Dr. Koenig does not know if, in fact, those conditions existed. Ex. 4, at 67:16-25. Similarly, in July 2021, Dr. Koenig's notes indicated he "suspect[ed] there's continued mold-moisture issues," but he testified that he did not know if there were any active mold-moisture issues at that time. Dr. Koenig July 13, 2021 Office Note, p. 5, attached as part of Exhibit 4; Ex. 4, at 84:18 to 85:1. Dr. Koenig based his belief that there was mold at Lindenwood on a picture he saw: "when there's discoloration and physical crumbling of a structure, that's what I would define as the likely presence of mold." Ex. 4, at 91:7-16. This is pure speculation, not stated to a reasonable degree of medical probability, lacks a proper foundation, and should be rejected where the objective evidence from Applied Laboratory Services and Mr. Zimmerman do not support Dr. Koenig's conclusion.

Dr. Koenig only reviewed one treatment record from Dr. Wenzel, despite Dr. Wenzel's years of regular treatment of Jordan, and Dr. Koenig did not receive any records for the three-year interim between when he saw Jordan in 2016 and when she returned in September 2019. Thus, he did not know of any diagnoses or complaints in that time, or whether or where Jordan was working. Ex. 4, at 29:23 to 30:7, 33:19 to 34:3, 34:11 to 35:3, 41:6-16.

Multiple of Dr. Koenig's opinions in his treating records were based on faulty assumptions that were later disproven. For instance, Dr. Koenig acknowledged at his deposition that there was no record of a roach/insect problem at Sherwood Forest, and agreed that those factors could be stricken from his opinions, even though his treatment records repeatedly asserted that roaches were a cause of Jordan's respiratory issues in Sherwood Forest. Ex. 4, at 101:13 to 102:22, 104:16 to 106:7. Dr. Koenig agreed that the issues he identified at Sherwood as causes of Jordan's respiratory issues – moisture intrusion, mold growth, and rodent infestation – were based on information

Jordan told him. *Id.* at 106:4-10. Dr. Koenig listed "possible asbestos exposure" among his assessment of Jordan, but testified that he had not diagnosed her with any asbestos related disease, and that Jordan was not exposed to asbestos, which was reportedly located on the school roof. Ex. 4, at 82:9 to 83:1.

Dr. Koenig's medical testimony is unreliable because it was based on inaccurate and incomplete self-reports from Jordan, and without knowledge of her work history or medical history from other providers. He "did not adequately investigate [the plaintiff's] relevant medical history" and lacked critical information needed to make a reliable differential diagnosis. *Perkins*, 626 F. Supp. 2d at 593 ("By taking Perkins' self-report at face value, and not developing an accurate medical history for his patient, Dr. Wardell neither knew nor considered Perkins' history of prior trauma and injury.").

In addition, Dr. Koenig volunteered to write opinion letters outside the scope of his qualifications in an effort to bolster his unsupported opinions and advocate for Jordan by critiquing air quality inspection reports and developing opinions about the same that were not part of his course of treatment of Jordan. Dr. Koenig admitted that he was not an industrial hygienist or certified mold inspector and assessor, had never performed air quality testing, and did not know the industry standards for air quality testing. Ex. 4, at 8:7-24, 80:25 to 81:2, 118:18 to 119:3. As with those of Dr. Fusiak, Dr. Koenig's opinions rendered without the requisite expertise and opinions that were not developed within the course and scope of his treatment should be excluded. See Virginia Code § 8.01-399; *Fantauzzo*, No. 2:21-CV-4, 2021 WL 5236490, at *5-*6.

Notwithstanding that he lacks the credentials to assess the reliability of the air quality testing performed by Applied Laboratories, at the request of Jordan's attorneys, Dr. Koenig has gone so far as to invert his opinions of the environmental testing reports once he became involved

in this litigation. Ex.4, at 113:6-16. In 2016, he opined that the Applied Labs study was "of great quality." Dr. Koenig May 17, 2016 Office Note, attached as part of Exhibit 4. In February 2021, he noted "normal environmental tests" of Sherwood that were performed in 2019. Dr. Koenig February 23, 2021 Office Note, p. 5, attached as part of Exhibit 4.; Ex. 4, at 80:1-22.

Dr. Koenig's opinions about the air quality testing changed abruptly in his May 31, 2022 letter, written at the behest of Jordan for use in her workers' compensation case, in which Dr. Koenig found "some plausible flaws" in their analysis. May 31, 2022 letter, Exhibit 7 to Dr. Koenig's deposition, attached as part of Exhibit 4. The same letter lists Dr. Koenig's "presumptions" about various building conditions and other factors and the effects those "may" have had on Jordan's asthma. *Id*. Stating what he "presumes" or what may or may not have had an effect on something is not stating an opinion to the requisite degree of specificity for medical opinions. Dr. Koenig's opinions should be excluded because they are purely speculative and do not satisfy the requisite degree of certainty for admissible medical opinions. *See Sharpe v. United States*, 230 F.R.D. 452, 460 (E.D. Va. 2005) ("For expert opinions to be admissible, they must be made within a reasonable degree of medical certainty, be based on sufficient facts or date, and not be merely subjective and speculative.").

Dr. Koenig also opined in his letter that Jordan "would be unusually susceptible" to Aspergillus, despite acknowledging in his deposition that Jordan's allergy tests in fall 2019 were negative with respect to Aspergillus, meaning she did not have an allergy to that type of mold. Ex. 4, at 63:7-19;May 31, 2022 letter attached as part of Exhibit 4 . Notwithstanding those negative test results, (and as explained by Dr. Tversky, "it would be impossible to have an allergic asthmatic response to something she is not allergic to"), Dr. Koenig again testified that aspergillus exposure at work specifically triggered Jordan's asthma. Ex. 4, at 125:3-24. Curiously, Dr. Koenig

interpreted one air quality test report to indicate that a mold count "is certainly a level comparable to what Ms. Jordan might have been subjected to outside (where mold counts generally are)." May 31, 2022 letter attached as part of Exhibit 4. Despite recognizing that outdoor mold exposure is higher, Dr. Koenig baselessly held fast to his belief that mold led to "repetitive deterioration in her asthma control at work," but failed to identify any evidence to support his theory. *Id.*

Dr. Koenig's speculative critique of the air quality testing reports is outside of his expertise and experience. It is therefore not reliable and should be excluded under Rule 702. His other opinions are based on inaccurate and incomplete data, and rely exclusively on Jordan's self-reports. His opinions are not reliable and should be excluded.

### E.    Deborah Mostert, LPC

Jordan's disclosure identifies that she sought treatment from Mostert in August 2021, "complaining of severe panic attacks, loss of concentration and energy, extreme hypervigilance, being easily startled, and having intrusive memories regarding being in toxic buildings," and the same day, Mostert "diagnosed Jordan with Post Traumatic Stress Disorder and recommended psychotherapy on a weekly basis," which Jordan continues. Ex. 1, p. 4. The disclosure states that "Mostert's appointment notes reflect that Jordan was often anxious during her sessions and relayed her anxiety about having to go to a Norfolk Public School fair, anxiety about being moved to a new school that was environmentally worse than the prior school where she was principal, having panic attacks and missing her career and job," and that Jordan "relayed anxiety, sadness, fear and anger concerning her employment dispute reflected in her EEOC case." *Id.* The disclosure at one point erroneously refers to "Dr. Mostert," but she is a licensed professional counselor, and not a medical doctor. *Id.*

Mostert testified at her deposition in the workers' compensation case that she has not reviewed any medical records from any of Jordan's other healthcare providers, including Dr. Cunningham, and that she does not "really care" about Jordan's other medications or diagnoses, but instead relies only on what Jordan tells her. Transcript of July 6, 2022 Deposition of Deborah Mostert, LPC, excerpts attached as "Exhibit 5," at 14:11 to 15:19. She was not aware when Jordan was first diagnosed with asthma. *Id*. at 17:2-6. She does not "know anything about the building other than what she [Jordan] told me," and has no knowledge of whether there were actually any problems at all in the school. *Id*. at 30:4-19, 48:2-21. Mostert did not know how many times Jordan went to Lindenwood before making the decision to take her out of work. *Id*. at 48: 22 to 49:10. She has not seen any environmental studies of the school buildings. Ex. 5, at 25:21-24, 29:18 to 30:19.

Mostert had no information about Jordan's work history, and despite basing her PTSD diagnosis on Jordan's "trauma" of not being able to breathe, could not provide any information about when or where Jordan experienced breathing difficulty, how often or how severe such breathing issues were, or if there was any indication those instances were life-threatening. Ex. 5, at 22:8-22, 28:16 to 29:4, 32:6-13.  Furthermore, Mostert had no information about Jordan's other medical conditions that could impact her symptoms (such as using "difficulty sleeping" to satisfy Criteria E of the DSM-5 definition of PTSD, but not knowing that Jordan has sleep apnea, Ex. 5 39:18 to 40:25), and Mostert repeatedly stated in her deposition that she did not "care" about information about Jordan's other conditions, including even the psychiatric medication prescribed for Jordan by Dr. Cunningham or when Jordan's alleged exposures occurred. Ex. 5, at 15:9-21; 20:15-20. After at first indicating that she no longer used the DSM, Mostert eventually acknowledged that the DSM is still the source of the criteria for PTSD. *Id*. at 26:6 to 27:20.

Nonetheless, Mostert did not properly apply the diagnostic criteria for PTSD in the DSM-5, for example stating that not all of the diagnostic criteria were required to make a diagnosis of PTSD, and stating that the third criteria ("persistent avoidance of the stimuli of traumatic events") "doesn't make any sense." Ex. 5, at 29:5 to 36:21.

In addition, much, if not all, of the disclosure regarding Mostert pertains to Mostert's notes about Jordan's subjective feelings. Expert testimony is not proper on this subject, because that is not a topic on which "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702. Instead, Mostert would simply be repeating Jordan's own experiences and emotional reactions thereto, which are proper subjects for Jordan's testimony. Attempting to bolster Jordan's testimony with Mostert's own account of what Jordan told her during therapy sessions is improper hearsay and abuses the authority of expert testimony to place greater weight on Jordan's account in the mind of the jury. Thus, any probative value of such testimony from Mostert is substantially outweighed by the danger of unfair prejudice, misleading the jury, and needlessly presenting cumulative evidence, in violation of Rule 403. Mostert's proposed testimony also goes well beyond the scope of the facts defined by the Court's Opinion, as, for example, nothing about the NPS "fair" (presumably the leadership academy) is alleged as a retaliatory act. ECF No. 13, pp. 22-24. Mostert's treatment is also not relevant to the remaining issues in the case, because her treatment records do not reflect that any of Jordan's mental health conditions, including the PTSD, were caused by a failure to accommodate her as alleged in the Amended Complaint or by retaliation for protected activity under the ADA.

### F.    Dr. Stephen Cunningham

Jordan's disclosure states that Dr. Cunningham "managed her psychiatric medication prescribed to ease anxiety and depression," and that "Angela Whiteside (Physician's Assistant at Dr. Cunningham's office) met with Jordan at most visits and relayed her communications with Jordan to Dr. Cunningham." Ex. 1, p. 4. It states that "Jordan discussed her panic attacks, increased anxiety when driving, anxiety involving her workplace, and inability to obtain proper sleep." *Id*. Dr. Cunningham submitted a letter to NPS dated August 30, 2021, "informing NPS officials that Jordan would remain out of work through 12/8/21 due to mental illness." *Id*.

Given Jordan's brief description on the disclosure, the proposed testimony of psychiatrist Dr. Cunningham does not appear relevant to any issues in the current posture of the case. Like the others, Dr. Cunningham relies solely on Jordan's self-reports, and does not appear to have considered any of Jordan's medical history in forming his opinions. The disclosure indicates that Dr. Cunningham has generally not directly treated Jordan, but has used physicians assistants to relay Jordan's complaints to him, so testimony from Dr. Cunningham about Jordan's complaints would be based on second-hand information and be needlessly cumulative of Jordan's own testimony. Instead, as with Mostert, using an expert to repeat Jordan's complaints would be unfairly prejudicial under Rule 403, as it would abuse the authority of the expert to place greater weight on Jordan's account in the mind of the jury. Notably, Dr. Cunningham has not endorsed or adopted the diagnosis of Mostert that Jordan has PTSD, which is the only mental health condition at issue given the Court's earlier ruling. ECF No. 13, p. 24. Testimony about his treatment of Jordan is also not relevant to the remaining issues in the case, because his treatment records do not reflect that any of Jordan's mental health conditions were caused by a failure to accommodate her or by retaliation for protected activity under the ADA.

Dr. Cunningham should be excluded as an expert since his proposed testimony is not relevant and is not based on a reliable foundation.

## <u>CONCLUSION</u>

**WHEREFORE**, for the foregoing reasons, Defendant, the School Board for the City of Norfolk, respectfully requests that this Honorable Court exclude the proposed medical expert testimony of the witnesses identified on Jordan's expert disclosure, and for all such other relief this Court deems just and proper.

SCHOOL BOARD OF THE CITY OF NORFOLK ,

_____/s_____
Of Counsel

Kristopher McClellan, Esquire (VSB No. 86424)
Assistant City Attorney
Bonnie P. Lane, Esquire (VSB No. 75608)
Assistant City Attorney
City Attorney's Office
810 Union Street
Norfolk, Virginia 23510
Phone: 757-664-4215
Fax:  757-664-4201
kristopher.mcclellan@norfolk.gov
bonnie.lane@norfolk.gov
*Counsel to Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 4th day of August 2023, I will electronically file the foregoing

with the Clerk of the Court using the CM/EFC system, which will then send a notification of such

filing (NEF) to the following:

Kevin E. Martingayle, Esquire
Bischoff Martingayle
3704 Pacific Avenue, Suite 300
Virginia Beach, VA 23451

 /s 
_____
Kristopher R. McClellan, Esquire
Bonnie P. Lane, Esquire
