UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CHERYL R. JORDAN,

        **Plaintiff,**

v.                              **Civil Action No. 2:22-cv-167**

SCHOOL BOARD OF
THE CITY OF NORFOLK, et al.

        **Defendant.**

## OPINION AND ORDER

In this disability discrimination and retaliation suit, the School Board of the City of Norfolk and Norfolk Public Schools ("Defendant" or collectively "NPS") moved for summary judgment, (ECF No. 21), against Plaintiff Cheryl R. Jordan ("Jordan" or "Plaintiff"), an NPS school principal. NPS argues that the evidence is insufficient as a matter of law to permit a reasonable juror to conclude that Jordan was denied a reasonable accommodation, both in regard to her request for entirely remote work and for reassignment,[1] or that Jordan was retaliated against for engaging in protected activity. Def.'s Mem. Supp. M. Summ. J. ("Def.'s Mem.") (ECF No. 22, at 2). Jordan opposed the motion and filed a cross-motion for partial summary judgement. (ECF No. 23). Jordan argues that genuine disputes of material fact—principally concerning her ability at the time of her request to perform her essential job functions while working fully remotely, the reasonableness of a school reassignment, the interactive process she received following her accommodation requests, and NPS' alleged acts of retaliation—preclude summary judgment for NPS on all her claims. Pl.'s Br. Opp'n Summ. J. & Pl's Br. Supp. Mot. Partial Summ. J. ("Pl.'s

---

[1] Jordan alleges that NPS failed to accommodate two requests for a reasonable accommodation: (1) a request for fully remote work from January 3 through June 30, 2021; and (2) a request to be transferred to a new school, specifically Richard Bowling Elementary, as principal. Am. Comp. (ECF No. 7 at ¶¶ 37–38).

Br.") (ECF No. 24, at 13–20). Additionally, Jordan argues that partial summary judgment should be granted to her on the claim failure to accommodate.[2] Id. at 14–15. NPS replied in support of their motion, (Def.'s Reply) (ECF No. 30) and opposed Jordan's motion (Def.'s Br. Opp'n to Pl'.s Mot. Partial Summ J.) ("Def.'s Opp'n") (ECF No. 33). Both parties requested a hearing. (ECF Nos. 34, 35).

This case was referred to me for all further proceedings under 28 U.S.C. § 636 (c) and Federal Rule of Civil Procedure 73. After reviewing both motions, the exhibits in the summary judgment record, and oral argument from counsel—for the reasons set out below—Plaintiff's Motion for Partial Summary Judgment (ECF No. 23) is **DENIED**, and Defendant's Motion for Summary Judgment, (ECF No. 21) is **GRANTED** in part, and **DENIED** in part.

## I. STATEMENT OF UNDISPUTED MATERIAL FACTS[3]

Plaintiff Jordan is currently, and was during the time period relevant to this suit, employed as a principal by Norfolk Public Schools, which is overseen by the School Board of the City of Norfolk (collectively "NPS"). Am. Compl. (ECF No. 7, at ¶¶ 2, 4); Def.'s Mem. (ECF No. 22, at ¶ 1). From July 2007 to August 2021, Jordan was the principal at Sherwood Forest Elementary School ("Sherwood" or "SFE"). Def.'s Mem. (ECF No. 22, at ¶ 1); Am. Compl. Ex. L (ECF No. 7-12, at 1). As discussed in further detail below, Jordan was reassigned to Lindenwood Elementary ("Lindenwood") as principal, effective August 17, 2021. Am. Compl. Ex. O (ECF No. 7-15).

---

[2] Plaintiff does not claim the right to summary judgment based on her claim of retaliation, but she opposes Defendant's motion for summary judgment (ECF No. 21) regarding retaliation. Pl.'s Br. (ECF No. 24, at 18–20); see also Pl.'s Mot. Partial Summ. J. ("Pl.'s Mot.") (ECF No. 23, at 1).

[3] Pursuant to Local Civil Rule 56, these facts are established by the movant's list of material facts that it contends are not in dispute, as well as the nonmoving party's list of undisputed facts and exhibits in the record. E.C. Va. Local Civil R. 56 (stating that unless "a fact is controverted in the statement of genuine issues filed in opposition to the emotion," the moving party's listing of material facts is admitted); (ECF Nos. 22, 24, 40).

During the height of the COVID-19 pandemic, from approximately March 2020 through March 2021, "NPS conducted 100% virtual learning," and Jordan "performed most of her duties" as principal of Sherwood remotely. Am. Compl. (ECF No. 7, at ¶ 8). Throughout the virtual learning period, Jordan "received positive performance evaluations." Id.

On or about November 12, 2020, Jordan provided NPS with a note from her treating pulmonologist, Timothy S. Fusiak, Doctor of Osteopathic Medicine. Id.; Am. Compl. Ex. B (ECF No. 7-2). Dr. Fusiak's note included the following:

> This is to confirm that Cheryl Jordan is followed in our office for asthma. Symptoms are exacerbated by environmental exposures specifically at place of employment. Encourage mediation of environmental hazards such as mold or animal/insect infestations as appropriate. Failing this, the patient would benefit [from] accommodations such as remote work as feasible.

Am. Compl. Ex. B (ECF No. 7-2). Four days later, on November 16, 2020, Jordan emailed an NPS employee "that she was suffering from 'restrictive lung disease' and asthma, and further advised that the Sherwood school building was making [her] sick." Am. Compl. (ECF No. 7, at ¶ 10).

Later that month, on November 30, 2020, Jordan contacted NPS officials to address her health and work-related concerns. Pl. Dep. Ex. 3 (ECF No. 22-1, at NPS.JR246). Specifically, Jordan emailed Dandridge Billups ("Billups"), NPS Chief Human Resources Officer, and Doreatha B. White ("White"), NPS Executive Director and Jordan's direct supervisor. Id. In her correspondence, Jordan informed Billups and White that she "was diagnosed with occupational asthma and mild restrictive lung disease." Id. Jordan stated that she "look[ed] forward to speaking to Mrs. Ricks on the Interactive ADA Process" Billups had discussed with her the previous Wednesday. Id. In support of her diagnosis,

Jordan attached the abovementioned note from Dr. Fusiak, as well as a summary of her most recent visit with her Allergy and Asthma Specialist. Id.

On December 2, 2020, an NPS representative was assigned to initiate Jordan's ADA interactive process, and Jordan was sent ADA request forms via email. Am. Compl. (ECF No. 7, at ¶ 12). On December 7, 2020, Jordan provided NPS with a physician's note indicating that Jordan was unable to work from December 8 through December 11, 2020, due to "anxiety, major depressive disorder and asthma." Id. at ¶ 13.

Jordan submitted her Accommodations Request Form to NPS on December 30, 2020. Am. Compl. Ex. D (ECF No. 7-4). In the Request, Jordan stated that she was unable "to perform the following essential function(s) of [her] job without accommodations(s): Work physically in the building due to environmental asthma and allergy triggers." Id. Jordan explained that she could not work inside Sherwood's building because of her severe asthma, sick building syndrome, and mild restrictive lung disease. Id. To accommodate her alleged limitations, Jordan requested: "[t]elework during the 6-month period of new treatment," and a "[m]odified schedule for appointments, asthmatic episodes and treatments." Id. Jordan requested these accommodations for six months, from January 3, 2021, to June 30, 2021. Id. Jordan also provided consent for NPS to obtain and review her medical information. Id.

In January 2021, Jordan provided NPS with documentation from her medical providers. Am. Compl. Ex. E (ECF No. 7-5, at 1–6). Specifically, three of Jordan's healthcare providers, Dr. Craig Koenig (allergist), Dr. Fusiak, and Dr. Paul Wenzel (primary healthcare provider), specified in supporting letters that Jordan could not work in the building until July 1, 2021. Id. Further, the physicians considered whether there was

4

an alternative accommodation, aside from remote work, that would allow Jordan to perform the essential functions of her job. Id. Dr. Wenzel provided there were no other accommodations he could "think of," and Dr. Koenig stated there were no other accommodations "at this time." Id. at 2, 4. Additionally, Dr. Fusiak left the question blank as to whether another accommodation existed, and noted elsewhere that Jordan could not be physically present as Sherwood "due to exacerbation of symptoms" until at least July 1, 2021. Id. at 5-6.

Amanda Shilling ("Shilling"), a Human Resources Specialist with NPS, sent Jordan a letter dated February 11, 2021, denying her request to work remotely and addressing her request for a schedule modification. Am. Compl. Ex. F (ECF No. 7-6, at 1–2); Pl. Dep. (ECF No. 22-1, at 23). In regard to Jordan's request for fully remote work from January 3, 2021, to June 30, 2021, the letter provided that:

> The essential functions of an elementary school principal, including broad responsibility for all educational, operational, and environmental functions of the school building, require that the principal perform these functions in their assigned school building. NPS has performed extensive remediation of environmental factors and general capital improvements projects at Sherwood Forest Elementary. Additionally, NPS is willing to provide you with an appropriate air purifier for your workspace (i.e. office) at the school division's expense. These accommodations address your physicians' concerns and should allow you to perform the essential functions of your job. Your request to perform all work duties via teleworking from home is denied accordingly.

Am. Compl. Ex. F (ECF No. 7-6, at 1). Regarding Jordan's second accommodation request for a modified schedule for appointments, asthmatic episodes, and treatments, the letter provided:

> Should you require a modified schedule that requires flexible time off from work, NPS requires that you complete the appropriate *Family Medical Leave Act* (FMLA) request. Based upon the information you submitted, you will want to request intermittent leave.

Id. On February 12, 2021, in response to the letter, Jordan emailed Schilling, Billups, and White. Am. Compl. Ex. G (ECF No. 7-7, at 1–2). In her reply, Jordan asked to "appeal the decision" regarding her accommodations, and raised concerns that the decision was made without her involvement or interaction. Id. Jordan acknowledged that NPS "has performed some remediation of the environmental factors at Sherwood," but that the "problems that trigger [her] asthma and other health issues . . . still exist[]." Id. at 1. Jordan accepted NPS's offer of an air purifier for her office but commented that she "travel[s] throughout the building all day." Id.; Pl.'s Dep. (ECF No. 22-1, at 23). Finally, Jordan rebutted NPS' conclusion that the essential functions of an elementary school principal require performance in the "assigned school building," and emphasized that since the start of the COVID-19 pandemic she has "performed all functions" as principal "mostly in a virtual setting." Am. Compl. Ex. G (ECF No. 7-7, at 1). Jordan argued she could remain virtual during her treatment and work cooperatively with her Assistant Principal to ensure they complete their required duties. Id. at 2.

NPS announced that students and faculty would return to in-person learning in March 2021. Am. Compl. (ECF No. 7, at ¶ 14). On February 23, 2021, Jordan requested Family and Medical Leave (FMLA) from March 1, 2021 to July 30, 2021. Pl. Dep. Ex. 6 (ECF No. 22-1, at NPS.JR267–74). On March 24, 2021, Billups approved Jordan's FMLA, but limited her leave to March 1, 2021, through May 21, 2021. Pl. Dep. Ex. 7 (ECF No. 22-1, at NPS.JR375).

On May 3, 2021, Jordan emailed Billups, copying White, that her doctor was submitting a request to extend her FMLA for three weeks, making her return date with no restrictions June 14, 2021. Id.; Am. Compl. Ex. H (ECF No. 7-8). Additionally, in the

6

same correspondence, Jordan requested to be transferred from Sherwood to "another school, as Principal." Am. Compl. Ex. H (ECF No. 7-8). Jordan sought reassignment "[i]n light of the medical challenges" she experienced while working at Sherwood. Id. Thereafter, Jordan no longer renewed her request for fully remote work, but instead sought reassignment as principal to a different elementary school.

On June 2, 2021, NPS released a job announcement for a vacant principal position at Richard Bowling Elementary School ("Richard Bowling"). Am. Compl. Ex. I (ECF No.7-9); see also Pl. Dep. (ECF No. 22-1, at 122). The job announcement included a "definition" of the principal position: "[he or she] [a]dministers the instructional, support, and operational functions of an elementary school; manages the staff, program and physical resources; performs related division wide administrative duties as required or assigned." Am. Compl. Ex. I (ECF No.7-9).

Jordan returned to work at Sherwood Forest on June 14, 2021. Am Compl. Ex. J (ECF No. 7-10, at 3). Soon thereafter, Jordan stated she "suffered a medical setback" and "was required to use an inhaler, nebulizer and to take prescribed medication," none of which "were necessary two months prior to returning to Sherwood." Id.

On June 21, 2021, Jordan met with White, and later that same day, had a meeting with both White and Dr. Lynell Gibson ("Gibson"), Chief of Schools. Id.; Def.'s Mem. (ECF No. 22, at ¶ 21). During the meeting, Jordan discussed her health concerns and requested to be reassigned to Richard Bowling. Def.'s Mem. (ECF No. 22, at ¶ 21). Gibson informed Billups of Jordan's reassignment request. Id.

On July 2, 2021, Billups denied Jordan's transfer request. Am. Compl. Ex. J (ECF No. 7-10, at 1–2) ("[A] reassignment from your position as Principal of Sherwood Forest

Elementary, has not been recommended or approved at this time."). On July 4, 2021,

Jordan emailed Dr. Byrdsong, all NPS School Board members, and other NPS officials a

detailed request for reconsideration. Id. at 1–4. Within the email, Jordan summarized her

previous correspondence with NPS concerning accommodations, and reiterated her desire

"to be reassigned to another building with a healthy and safe environment." Id. at 4. Jordan

did not identify a preferred school. Id.

On August 9, 2021, Jordan filed a formal Charge of Discrimination with the Equal

Employment Opportunity Commission ("EEOC"). Am. Compl. Ex. L (ECF No. 7-12, at

1–2). Jordan alleged discrimination based on "retaliation" and "disability," and provided

the following facts:

> I began employment for Respondent on or about 1997 and became a Principal in
> July 2007. I have always met or exceeded my performance expectations. On or
> about November 2020, I informed Dr. White, Executive Director, that I was
> diagnosed with a medical condition that affected a major life function. Dr. White
> shared my diagnosis with Mr. Billups [sic], Chief of HR. In February 2021, I
> requested to work from home as an accommodation. On February 11, 2021, I was
> denied my request and was informed that Respondent was willing to provide an
> appropriate air purifier [sic] for my workspace. I sent an appeal with photographs
> of the school and expressed my concerns that I could not walk around the school
> without being exposed to harsh air conditions that affected my medical condition.
> My appeal was ignored. After my appeal was ignored, my doctor completed FMLA
> paperwork and was forced out on FMLA from March 1, 2021 – June 11, 2021.
>
> I then requested to be reassigned or retransferred to an available position within the
> city. I was aware of several positions that were open or were expected to become
> available soon. My request was again denied. I was forced to return to the building
> on June 14. 2021 and have subsequently been subjected to further harm and
> continue to become ill due to my employer's negligence. Although Respondent
> placed on Air Purifier in my office, this attempt to accommodate my request was
> ineffective, therefore I was forced to place an additional purifier in my office in
> attempt to preserve my health. I have made attempts to address the ineffectiveness
> of the accommodation set as well as other issues with my employer, to include
> sending an email to board members and the superintendent. My Pulmonary
> Specialist and Allergy & Asthma Specialist also sent letters to the Superintendent
> requesting my reassignment to another school without the environmental concerns.

> These efforts have fallen on deaf ears [sic] and I continue to suffer adverse health effects due to my working conditions.
>
> I believe I was denied an effective reasonable accommodation, in retaliation for participating in protected activity, in violation of the Americans with Disabilities Act of 1990, as amended.

Am. Compl. Ex. L (ECF No. 7-12, at 1–2). That same day, on August 9, Billups responded to Jordan's email from July 4 as Superintendent Byrdsong's designee. Pl. Dep. Ex. 14 (ECF No. 22-1, at NPS.JR649–56). Billups' reply to Jordan's request for reconsideration was extensive, and he addressed various claims and assertions put forth by Jordan. Id.; Pl. Dep. (ECF No. 22-1, at 82–88). For instance, Billups recognized Jordan's assertion that she was in "total compliance" with the School Board Policy regarding reassignment requests, but noted that a request for a voluntary transfer is not "automatically approved" and "of [the] 147 teacher requests for voluntary transfer, only 34 (23%) were able to be accommodated." Pl. Dep. Ex. 14 (ECF No. 22-1, at NPS.JR653).

The following day, on August 10, 2021, Jordan emailed Billups, Gibson, and White, to reiterate her request for a transfer. Am. Compl. Ex. N (ECF No. 7-14) ("I am once again, as my Specialists have, requesting to be reassigned to another school."). Additionally, for the first time in writing, Jordan request to be reassigned to Richard Bowling:

> I am aware that a principal has not been assigned to Richard Bowling Elementary. I am therefore asking again, to be reassigned there. Richard Bowling is a fairly new school and should provide a safe and healthy environment; thus preventing recurrent asthmatic episodes.

Id. (emphasis removed). On August 17, 2021, Jordan was notified by Billups that she was being reassigned to Lindenwood Elementary School ("Lindenwood"). Am. Compl. Ex. O (ECF No. 7-15). That same day, Jordan responded to Billups and protested her

reassignment to Lindenwood. Am. Compl. Ex. P (ECF No. 7-16). Jordan stated that she "specifically asked to be reassigned to Richard Bowling" because it "was built just a few years ago and would not pose a threat to my health." Id. Jordan emphasized her disappointment and shared her belief that her "health clearly was not taken into consideration, nor was it a priority, when making the decision to reassign [her] to Lindenwood Elementary." Id.

After Jordan's reassignment to Lindenwood on August 17, 2021, she reported to the Lindenwood building for one week. Pl. Dep. (ECF No. 22-1, at 16); Def.'s Mem. (ECF No. 22, at ¶ 32). After that week, Jordan's physician has held her out of work entirely since August 2021 "due to mental illness," and she has not performed any work since. Def.'s Mem. (ECF No. 22, at ¶¶ 16, 31); Pl. Dep. (ECF No. 22-1, at 16). Nonetheless, NPS renewed Jordan's employment contract through the 2023-2024 school year.[4] Pl. Dep. (ECF No. 22-1, at 16).

On August 26, 2021, Jordan met at Lindenwood "to discuss building concerns" with White, Richard Fraley (NPS Chief of Operations), Anthony Brown (Senior Coordinator of Custodial Services), and Daniel Johnson (Senior Director for Facilities Management). Fraley Dep. (ECF No. 22-10, at 45). NPS subsequently hired independent contractors to inspect Lindenwood. Def.'s Mem. (ECF No. 22, at ¶ 34); Def.'s Mem. Ex. 5 (ECF No. 22-5, at 200–02); see also Def. Mem. Ex. 7 (ECF No. 22-7, at NPS004076). Although the significance of these inspections is in dispute, as discussed below, they generally showed indoor air quality at Lindenwood did not present an elevated risk of exposure to mold. Def.'s Mem. Ex. 7 (ECF No. 22-7, at NPS004088) ("Consequently, as

---

[4] In her deposition, Plaintiff stated that her 2023-2024 employment contract does not specify a school. P. Dep. (ECF No. 22-1, at 16). Defendants contend that she remains the assigned principal of Lindenwood. Def.'s Mem. (ECF No. 22, at ¶ 31).

is evident by the exterior control samples is that an individual would be expected to be exposed to[] similar or greater levels of mold when outdoors for much of the year than what was found in the area tested.").

On January 4, 2022, the EEOC issued a "Dismissal and Notice of Rights" regarding Jordan's EEOC claim. Am. Compl. Ex. R (ECF No. 7-18). According to the Notice, the EEOC closed its file on Jordan's case without making a determination of the merits of the claim. Id. Further, the notice advised Jordan that she had a "right to sue" under the ADA, and that a lawsuit under such provisions must be filed within ninety (90) days of the notice." Id.

On March 30, 2022, eighty-five (85) days later, Jordan filed her Complaint in the Circuit Court for the City of Norfolk alleging violations of the ADA. (ECF No. 1-1). The case was removed and on November 9, 2022, Judge Rebecca Beach Smith dismissed Counts II and III of Jordan's Amended Complaint which alleged parallel causes of action under Virginia State law. (ECF No. 7). (ECF No. 13, at 1-2). Regarding the remaining Count I, Judge Smith found that Jordan alleges "two violations of the ADA: failure to provide reasonable accommodations, in violation of 42 U.S.C. § 12112(b)(5)(a), and retaliation, in violation of 42 U.S.C. § 12203(a)." (ECF No. 13, at 14). Judge Smith identified "two different requests for accommodation," including (1) a request for fully remote work; and (2) a request to be transferred to a new school as principal (which, at some point, Jordan narrowed to a request to be transferred to Richard Bowling). Id. at 17–18. Considering both accommodation requests, Judge Smith concluded that dismissal was not appropriate "at this early juncture" or "stage of litigation" given Jordan's allegations. Id. at 18, 20. As to the retaliation claim, Judge Smith found Jordan engaged in "two types

11

of protected activity: (1) requesting accommodations for her disability … and (2) filing an

EEOC Charge against Defendant." Id. at 22.  Again, Judge Smith found that dismissal of

the retaliation claim was not appropriate based on Jordan's plausible allegation of

retaliation.  Id. at 25.  With discovery concluded, and relying on the facts set forth above,

and contentions outlined below, both parties seek judgment as a matter of law.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary

judgment if "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett,

477 U.S. 317, 322-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "A material fact is one 'that might

affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue

'if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the

basis of its motion and identifying materials in the record it believes demonstrates the absence of

a genuine dispute of material fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-24.  When

the moving party has met its burden to show that the evidence is insufficient to support the

nonmoving party's case, the burden shifts to the nonmoving party to present specific facts

demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

In considering a motion for summary judgment, "the court must draw all reasonable

inferences in favor of the nonmoving party, and it may not make credibility determinations or

weigh the evidence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); see <u>Anderson</u>, 477 U.S. at 255.   "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

Rule 56 permits partial summary judgment on claims and defenses. Fed. R. Civ. P. 56(a). "A motion for partial summary judgment utilizes the same standards required for consideration of a full motion for summary judgment." <u>Pettengill v. United States</u>, 867 F. Supp. 380, 381 (E.D. Va. 1994) (citing <u>Gill v. Rollins Protective Servs.</u>, 773 F.2d 592, 595 (4th Cir. 1985), amended, 788 F.2d 1042 (4th Cir. 1986); Fed. R. Civ. P. 56(d)).   Partial summary judgment expedites the trial process:

> [P]artial summary judgment is merely a pretrial adjudication that certain issues shall  be deemed established for the trial of the case. This adjudication . . . serves the purpose of speeding up litigation by" narrowing the issues for trial to those over which there is a genuine dispute of material fact.

<u>J.E. Dunn Constr. Co. v. S.R.P. Dev. Ltd. P'ship</u>, 115 F. Supp. 3d 593, 599 (D. Md. 2015) (quoting <u>Rotorex Co. v. Kinsbury Corp.</u>, 42 F. Supp. 2d 563, 571 (D. Md. 1999)).   It "avoid[s] a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit." <u>In re Norfolk, Balt. & Carolina Line, Inc.</u>, 478 F. Supp. 383, 386 (ED. Va. 1979) (quoting <u>Luria Steel & Trading Corp. v. Ford</u>, 9 F.R.D. 479, 481 (D. Neb. 1949)).

### III. ANALYSIS

**A.    NPS' Motion for Summary Judgment on Jordan's Claim for Failure to Accommodate.**

Jordan alleges violations of the ADA based on NPS' failure to accommodate her request to work entirely remotely from January 3, 2021, to June 30, 2021, and by not honoring her

subsequent transfer request to another school with a healthy environment – specifically Richard Bowling.[5]  See 42 U.S.C. §12112(b)(5)(A)-(B); Pl.'s Br. (ECF No. 24, at 12–17).  Since Jordan alleges two different failures to accommodate, and both parties have moved for summary judgment on those allegations, the court will consider each claim in turn.  Pl.'s Br. (ECF No. 24, at 12–17); Def.'s Mem. (ECF No. 22, at 11–22).

In general, the ADA prohibits a covered employer from "discriminating against a qualified individual on the basis of disability," which includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. §12112(a), (b)(5).  A "qualified individual" is one "who with or without reasonable accommodation, can perform the essential functions of the employment position.  42 U.S.C. §12118(8).  Thus, whether a disabled employee is a qualified individual, and thus is protected under the ADA, hinges on whether that individual can perform the "essential functions" of their position with "reasonable accommodations."  See id.

To establish a prima facie case for failure to accommodate, therefore, Jordan must show: "(1) that she had a disability within the statutory meaning; (2) that the employer knew of her disability; (3) that a reasonable accommodation would permit her to perform the essential functions of the position; and (4) that the employer refused to make the accommodation."  Perdue v. Sanofi-Aventis U.S., LLC, 99 F. 3d 954, 959 (4th Cir. 2021) (citing Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013)).  The employer "may reasonably accommodate an employee without providing the exact accommodation that the employee requested."  Reyazuddin v. Montgomery Cty., Md., 789 F.3d 407, 415 (4th Cir. 2015).  A reasonable accommodation is one "that enables a qualified individual with a disability … to perform the essential functions of [a]

_____

[5] Jordan did not submit a written request to be transferred to Richard Bowling until August 10, 2021. Am. Compl. Ex. N (ECF No. 7-14).

position." <u>Jacobs v. N.C. Admin. Office of the Courts</u>, 780 F.3d 562, 580 (4th Cir. 2015).  The ADA explicitly anticipates that a reasonable accommodation may include "job restructuring, part-time or modified work schedules, [and] reassignment to a vacant position."  42 U.S.C. § 1211(9)(B).  However, an employer does not have to provide "an accommodation that would require other employees to work harder" nor does the employer have to change "the essential functions of" the position to accommodate an employee.  <u>Lewis v. Gibson</u>, 621 F. App'x 163, 164–65 (4th Cir. 2015) (internal citation and quotation omitted).

As the foregoing factual summary illustrates, the parties do not dispute—for the purposes of summary judgment—that the first two elements of Jordan's *prima facie* case are met.  Regarding the first element, Jordan's asthma and allergy triggers, Am. Compl. (ECF No. 7, at 3); (ECF No. 42, at ¶ 4), which continue to require medical treatment, qualify as a "physical … impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1).  Considering the second element, NPS does not dispute that it had notice of Jordan's disability given, among other things, her extensive correspondence, direct requests for accommodations, and her EEOC charge. <u>See</u> Def.'s Mem. (ECF No. 22, at 1–9, 11).

But, NPS argues Jordan cannot establish her prima facie face regarding either allegation for failure to accommodate because on the undisputed facts, no reasonable juror could find (1) she is a qualified individual with a disability on the request for fully remote work, or (2) that NPS failed to provide a reasonable accommodation by transferring her to Lindenwood. <u>Id.</u> at 11–22. I agree with (1) but not (2).

1.    **Physical Presence is an Essential Function of Jordan's Job as Sherwood's Principal and Fully Remote Work for the Period Requested was not a Reasonable Accommodation.**

Jordan argues NPS failed to provide a reasonable accommodation when it denied her request to work entirely remotely from January 3, 2021, to June 30, 2021. Pl.'s Br. (ECF No. 24, at 14-15); Am. Compl. Ex. D (ECF No. 7-4). NPS argues that it is entitled to summary judgment on this claim because Jordan could not perform the essential functions of her job as principal—after students and teachers returned to the classroom—with the requested accommodation to work fully remotely for six months. As a result, she was not a "qualified individual with a disability" under the ADA. Def.'s Mem. (ECF No. 22, at 11) (citing 42 U.S.C. § 12111(8)). Jordan disagrees, and moved for summary judgment in her favor, arguing physical presence is not essential, and no reasonable juror would conclude otherwise. The reasonableness of Jordan's request for remote work can therefore be narrowed to one controlling question: whether physical presence was an essential function of Jordan's position – elementary school principal. As explained below, the undisputed facts demonstrate that physical presence was an essential function of Jordan's job as elementary school principal during the time she sought accommodation by fully remote work. Because Jordan was unable to perform the essential functions of her job fully remotely, she was not a "qualified individual with a disability," and NPS was not required to grant her request for fully remote work. See 42 U.S.C. § 12111(8).

Under the ADA, essential functions are those "that bear more than a marginal relationship to the job at issue." Cook v. United Parcel Serv., Inc., 2022 WL 1090251, at *3 (4th Cir. Apr. 12, 2022). The Plaintiff has the burden of identifying a reasonable accommodation that would allow a qualified individual to perform the job. Shin v. Univ of Md. Med. Sys. Corp., 369 F. App'x 472, 481 (4th Cir. 2010). The ADA explicitly directs that "consideration shall be given to the

employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Employers have a "good faith duty to engage with [their employees] in an interactive process to identify a reasonable accommodation. Jacobs, 760 F.3d at 581 (internal quotation omitted). But "an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position." Id.

Here, Jordan requested to work remotely from January 3, 2021, to June 30, 2021, following NPS' return to classroom instruction. Am Compl. Ex. D (ECF No. 7-4). In support of this accommodation request, Jordan and her three physicians unequivocally stated she could not physically work at Sherwood for the six-month period. Pl. Dep Ex. 5 (ECF No. 22-1); Am. Compl. Ex. E (ECF No. 7-5, at 2, 4, 5). Jordan and her physicians failed to identify any other accommodation aside from remote work during this period. Am. Compl. Ex. E (ECF No. 7-5, at 2, 4, 5). In response to Jordan's request for remote work, NPS explained that her request was denied because "[t]he essential functions of an elementary school principal, including broad responsibility for all educational, operational, and environmental functions of the school building, require that the principal perform these functions in their assigned school building." Am. Compl. Ex. F (ECF No. 7-6, at 1). Jordan calls NPS' argument here "misleading" because the Board did not ask Jordan's providers for "any further information or opinions, nor did the School Board engage in any dialogue with Jordan to identify or discuss alternatives. Pl.'s Br. (ECF No. 24, at ¶ 9). But, as Plaintiff, Jordan bears "the burden of identifying a reasonable accommodation that would allow a qualified individual to perform the job." Shin, 369 F. App'x at 481. Moreover, the

17

Fourth Circuit has specifically stated that "an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position." Jacobs, 780 F.3d at 581 (citation omitted). Because Jordan identified only remote work as her requested accommodation during this period, NPS was only required to consider whether Jordan could perform all the essential functions of her position fully remotely. See id.

Following the system's return to in-person learning, NPS asserts that Jordan could not perform all of the essential functions of a principal while working fully remotely, arguing she must have "some regular physical presence in the school building" to complete her duties as principal, "including but not limited to: interactions with teachers, staff, students, parents, and community members; observations of teachers; and ensuring the safety and condition of the building." Def.'s Mem (ECF No. 22, at 11–14). In support of this argument, NPS relies on Superintendent Dr. Sharon Byrdsong's testimony who was, during all relevant times, "the sole decisionmaker regarding lateral transfers and reassignments of principals." Id. at ¶ 16; Byrdsong Dep. (ECF No. 22–8, at 151). Dr. Byrdsong described "[o]ne of the major responsibilities of building principal . . . [as] instructional leadership, and it would be impossible to go in to observe classroom instruction as it is taking place while you're at home and being able to provide that feedback and support to teachers." Byrdsong Dep. (ECF No. 22-8, at 140). Further, Dr. Byrdsong explained that "things happen on a daily basis . . . that involves the engagement of the building principal to help problem solve, to help manage, to help lead, and if you're not physically there, that's very difficult." Id.

NPS also cites Jordan's own testimony concerning her "daily practice" which, shows Jordan "herself believed being physically in the building was and is an important component of the job." Def.'s Reply (ECF No. 30, at 4). For example, Jordan testified that from 2007 to

September 2019, her "typical day" as principal included walking throughout her assigned school building, greeting students and teachers, and observing classroom lessons. Def.'s Mem. Ex. 4 (ECF No. 22-4, at 26–28). Even during the pandemic when all learning was remote, Jordan continued to regularly return to the school building once or twice a week. Def.'s Mem. Ex 2 (ECF No. 22-1, at 137).

The NPS official classification specification for the position of elementary principal also confirms that physical presence was an essential function of Jordan's position. Def.'s Reply (ECF No. 30, at 4); see Billups Aff., Ex. B (ECF No. 22-3, at NPS004270–72). In the specification, NPS explicitly includes a section devoted to the principal's essential functions. Id., at NPS004270–71. Here, the specification includes that the principal "[a]cts a liaison between the school and community . . . and encourage[es] community participation in school life." Id. at NPS004270. Further, the specifications includes that the principal "[a]ssists in the hiring, training, assigning and evaluating of the school professional staff," and "[a]ssumes responsibility for the safety and administration of the school plant." Id. Lastly, in the "unusual demands" section of the specification, it includes that "[w]ork is located in schools and is subject to normal interruptions." Id. at NPS004272 (emphasis added). Considering the above-mentioned functions, these facts establish that Jordan's duties unequivocally required her physical presence. Def.'s Reply (ECF No. 30, at 4).

Jordan attempts to define the essential functions of her position relying on three NPS job announcements for vacant principal positions and on her own experience as principal during the pandemic. Pl.'s Br. (ECF No. 24, at 14–15); Pl'.s Br. Ex. 1 (ECF No. 24-1, at 1–8). She argues that these job announcements for elementary school principal show that physical presence is not an essential function of the position. Pl.'s Br. (ECF No. 24, at 14–15); Pl.'s Br. Ex. 1 (ECF No.

24-1, at 1–8). Specifically, Jordan points to three NPS job announcements for vacant principal positions in 2019 and 2020. Pl.'s Br. Ex. 1 (ECF No. 24-1, at 1–8). Each announcement included the following identical list which paraphrase the NPS specifications document and describe the nature of the principal position:

- Supervises the school's education program.
- Assumes responsibility for the implementation and observance of all board policies and regulations by the school's staff and students.
- Supervises all professional, paraprofessional, administrative and nonprofessional personnel assigned to the school.
- Assists in the hiring, training, assigning, and evaluating of the school professional staff.
- Assumes responsibility for the safety and administration of the school plant.
- Assists in the in-service orientation and training of teachers, with special responsibility for staff administrative procedures and instructions.
- Supervises the preparation of all school reports for the central office.
- Assumes responsibility for attendance, conduct, and health of students.
- Assists in the management and preparation of the school budget.
- Supervises the maintenance of accurate progress and attendance records for students.
- Acts as liaison between the school and the community, interpreting activities and policies of the school and encouraging community participation in school life.
- Conducts staff meetings as necessary for the proper functioning of the school.
- Performs division-wide instructional or management duties as assigned.
- Performs other duties as assigned.
-

Id. at 2, 5, 7. Jordan contends that these job descriptions fail to "give any indication that working remotely would be infeasible, unreasonable or unduly burdensome."[6] Pl.'s Br. (ECF No. 24, at 13). Further, Jordan argues that the "job descriptions . . . do not state or even suggest that [the essential] functions cannot be performed remotely." Id. at 14.

Jordan also cites her own experience working remotely during the COVID-19 pandemic as evidence that she could perform the essential functions of her job fully remotely. Id. at 14.

---

[6] NPS released these announcements on March 8, 2019, November 8, 2019, and February 7, 2020. Pl.'s Br. Ex. 1 (ECF No. 24-1).

Specifically, Jordan contends that she "previously performed her job functions remotely and expressed the ability to do so on an ongoing basis." Id. Jordan cites Superintendent Byrdsong's lack of performance complaints during her time of remote work as evidence of her ability to continue to work remotely despite the return to pre-pandemic, in-person teaching and attendance for all other members of Lindenwood's community. Id.

After considering Jordan's evidence, I do not find any dispute of material fact regarding the essential nature of a school principal's physical presence after the return to in-person learning. Although Jordan attempts to create a dispute of fact regarding physical presence, citing NPS job announcements and her own personal experience, examining those facts closely, neither presents a material issue for trial. First, regarding the job announcements, Jordan attempts to create a dispute of fact where none exists. While it is true that the announcements (all of which predate her request for accommodation) lack the specific words "physical presence" and do not explicitly prohibit remote work, the duties described in each of them clearly imply that physical presence is necessary. For example, the principal "[a]ssumes responsibility for the safety and administration of the school plant." Pl.'s Br. Ex. 1 (ECF No. 24-1, at 2, 5, 7) (emphasis added). They require that the principal "[s]upervises all professional, paraprofessional, administrative, and nonprofessional personal assigned to the school" and "[a]ssists in the hiring, training, assigning, and evaluating of the school professional staff" and "[a]ssumes responsibility for attendance, conduct, and health of students." Id. These duties require that the principal will actively engage with her school's employees and community, all of whom are in the school building. Thus, when all other members of the community are present in-person, NPS is justified in requiring the principal to report to her assigned building as an essential function.

21

The court is also not persuaded by Jordan's argument that since she performed remotely during the COVID-19 pandemic, she can work remotely again and accomplish all essential functions of her position. Am. Compl. (ECF No. 7, at ¶ 8). During the COVID-19 pandemic, employers permitted telework and frequently excused performance of one or more essential functions. Maffett v. City of Columbia, 2021 WL 4596659, at *19 (D.S.C. Apr. 19, 2021) (quotation omitted), report and recommendation adopted, 2021 WL 4237189 (D.S.C. Sept. 17, 2021). However, these temporary pandemic-related modifications "of certain essential functions does not [] mean that the essential functions have somehow changed." Id. at 19. Thus, once NPS required students and employees to return for in-person instruction, Jordan was required to resume her "job's essential functions" as they "were in the pre-COVID era." Id. According to NPS, Jordan's essential functions require physical presence at her assigned school building, and no reasonable factfinder would conclude otherwise on this record. Def.'s Mem. (ECF No. 22, at 11).

Since Jordan has failed to demonstrate that she could perform the essential functions of her job remotely, she was not a qualified individual under the ADA. She has not established her prima facie case for failure to accommodate during the period she and her doctors precluded work in the school building.

> **2.    Disputes of Material Fact Preclude Summary Judgment on Jordan's Claim for Failure to Accommodate her Transfer Request.**

In Jordan's second argument concerning NPS' failure to accommodate, she asserts that NPS failed to provide a reasonable accommodation by transferring her to Lindenwood, and not Richard Bowling. Pl.'s Br. (ECF No. 24, at 15). NPS argues that it is entitled to summary judgment on this claim because "Lindenwood was a reasonable and adequate accommodation," and Jordan has failed to provide any evidence to the contrary. Def.'s Mem. (ECF No. 22, at 22). In contrast, Jordan argues that she is entitled to summary judgment because the evidence shows

Lindenwood was in poor condition, like Sherwood, and thus was not a reasonable accommodation. (ECF No. 24, at 14–17).

Jordan's position is that her reassignment to principal of Lindenwood was not a reasonable accommodation under the ADA because she requested a transfer to a "healthy environment," specifically Richard Bowling, but was instead reassigned "to an even older and potentially more run-down school" than Sherwood that "was known to be in poor condition." Pl.'s Br. (ECF No. 24, at 15). To support this argument, Jordan cites to various exhibits and excerpts from deposition testimony indicating Lindenwood's old age and poor condition. See Pl's Br. (ECF No. 24, at 15–16). For example, concerning Lindenwood's age, Jordan cites to Dr. Byrdsong's testimony where she indicates "that as of July 2021[,] Sherwood Forest was sixty-three years old and Lindenwood was sixty-seven years old." Byrdsong Dep. (ECF No. 24-5, at 93). Jordan further contends that inspections at Lindenwood showed there were hazards present and evidence of the building's poor condition. Id. at ¶ 34. Jordan also references environmental testing performed by NPS at Lindenwood, in September 2021, which provides, among other things, that "corrective actions are warranted based on the conditions observed" and that "one should always rely on one's own symptoms and the advice of a health care provider when determining sensitivity to airborne mold." Pl.'s Br. Ex. 7 (ECF No. 24-7, at NPS.JR117). Jordan also cites School Board Member Rodney Jordan's deposition testimony wherein he discusses "a document from Cooperative Strategies dated April, 2020, Master Facilities Plan 1, Draft Options." Pl.'s Br. Ex. 2 (ECF No. 24-2, at 50–51). Rodney Jordan stated that he received this document as a member of the school Board, and he observed that the document listed Lindenwood "with a group of under-utilized and poor condition schools." Id. at 51. Jordan also believes that Dr. Byrdsong was aware of the "poor" condition at Lindenwood prior to her transfer because "reports provided to the Board" during

Byrdsong's tenure indicated that "both Sherwood Forest and Lindenwood were schools in 'poor' condition." Pl.'s Br. (ECF No. 24, at ¶ 29). Therefore, "Byrdsong had to be aware of potential hazards at Lindenwood for a highly sensitive and vulnerable person as Jordan." Id.

Defendant's responds, arguing that Lindenwood was a reasonable accommodation and Jordan has "no evidence that the environment in Lindenwood was unhealthy and thus not a reasonable accommodation." Def.'s Reply in Opp'n (ECF No. 33, at 14). NPS argues that Dr. Byrdsong believed when she made the reassignment decision that Lindenwood had no environmental concerns. Id. at 4. The school system also points to testing performed after Jordan's reassignment to Lindenwood. Id. NPS contends that these tests "confirmed there were no negative impacts on the indoor environment." Id. at 22. Finally, NPS notes that "[n]o doctor has ever said that [Jordan] cannot work in Lindenwood due to environmental issues." Def.'s Mem. (ECF No. 22, at 20). In sum, Defendant argues that "Jordan has cited no admissible evidence indicating Lindenwood had any actual environmental concerns (as opposed to aesthetic)." Id.

The records cited by each party demonstrate genuine disputes of material fact concerning Lindenwood's condition and preclude summary judgment for either party on Jordan's request for reassignment. Jordan has testified that her health worsened after trying to work in-person at Lindenwood. Pl. Dep. (ECF No. 22-1, at 16). Her doctors have attributed this to exacerbation of her condition by environmental factors. Although no doctor has specifically described the particular condition at Lindenwood that caused Jordan's symptoms, viewing the facts favorable to Jordan, they might lead a fact finder to conclude that her transfer to Lindenwood was not reasonable, especially given the alleged availability of a transfer to Richard Bowling. Although no separate environmental testing was completed at Richard Bowling, the record demonstrates the

24

school was nearly new, and had no condition issue of the type extensively documented at Lindenwood or Sherwood Forest.

But a factfinder might also rely on the complete absence of evidence of the environmental conditions at Richard Bowling, or any documented condition at Lindenwood known to have exacerbated Jordan's symptoms, to conclude that the transfer to Lindenwood was reasonable. The air quality testing at Lindenwood is strong evidence that the building's age and poor condition were not producing environmental hazards of the type Jordan's doctors were concerned about. And the absence of any testing from Richard Bowling may lead the factfinder to conclude that Jordan was only speculating regarding the absence of environmental hazards there. Finally—if Richard Bowling was the only school identified as appropriate environmentally—but the NPS had other legitimate employment or pedagogical reasons for placing another principal there—the factfinder might well conclude that such a request for accommodation was not reasonable.

These, however, are issues for trial and neither party has established a right to summary judgment on the existing record.

## B.     NPS' Motion for Summary Judgment on Jordan's Retaliation Claim

The remaining issue is whether NPS is entitled to summary judgment on Jordan's claim for retaliation. Def.'s Mem. (ECF No. 22, at 22); Pl.'s Br. (ECF No. 24, at 19–20). Jordan's position is that NPS reassigned her to Lindenwood, which she alleges is equally or more harmful to her health than Sherwood, in retaliation for her accommodation requests and EEOC charge. Pl.'s Br. (ECF No. 24, at 19–20). On the other hand, NPS argues that Jordan cannot establish a *prima facie* case for retaliation because she cannot prove a causal link, nor can she show that her reassignment to Lindenwood was retaliatory or materially adverse. Def.'s Mem. (ECF No. 22, at 22–29).

With regard to retaliation, the ADA states that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To survive summary judgment on her retaliation claim, Jordan must offer evidence demonstrating a material issue of fact as to three elements: (1) that she engaged in a protected activity; (2) that her employer took materially adverse action against her; and (3) that three was a causal link between these two events. See Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 265, 281 (4th Cir. 2015). The filing of an EEOC charge, or requesting accommodation for a disability, are both activities protected under the ADA. 42 U.S.C. § 12203(a).

Again, genuine disputes of material fact preclude the court from entering summary judgment. Specifically, and as mentioned above, Jordan and NPS have conflicting evidence concerning the condition of Lindenwood. See Def.'s Mem. (ECF No. 22-7, at NPS004088); Pl.'s Br. Ex 7 (ECF No. 24-7, at NPS.JR116). Reasonable jurors might rely on this evidence to conclude a transfer to Lindenwood made things worse, not better. Therefore, there is a genuine dispute regarding whether Jordan's reassignment to Lindenwood was materially adverse.

And despite NPS' contention, the parties also dispute whether Dr. Byrdsong had knowledge of Jordan's EEOC charge (or her other protected activity) prior to deciding to reassign her to Lindenwood, or if she did, whether the evidence of her knowledge is sufficient to demonstrate causation. Jordan argues that Byrdsong, the undisputed decisionmaker on her request for reassignment, did have knowledge of her EEOC action (or, in the alternative, recent knowledge she undertook other protected activities), prior to her reassignment. Pl.'s Mem. (ECF No. 24, at 19). Jordan admits she does not have "direct evidence that Byrdsong knew of the EEOC complaint

26

at the time of reassignment," but argues she can "rely upon circumstantial evidence tending to show that [Byrdsong] knew before the final reassignment decision was made." Id. at ¶ 30. I agree with Jordan, that at this stage of the proceedings a reasonable juror might rely on this circumstantial proof.

The NPS Chief Human Resources Officer, Billups received direct communication about Jordan's EEOC charge and had a meeting with Byrdsong the same day. Id. at 19. Jordan's transfer to Lindenwood happened less than one week after this meeting and notice. While Byrdsong has testified that she was unaware of the EEOC charge, there is ample evidence that she knew of the other protected activity as NPS was in the process of considering a transfer request as a reasonable accommodation. Jordan also alleges that Byrdsong knew Lindenwood was in poor condition prior to her reassignment, and nonetheless failed to reassign her to Richard Bowling. Id. at ¶¶ 18, 29. As discussed above, disputes of fact regarding the condition of both schools — relative to Jordan's condition — preclude resolution of this question on the present record.

In sum, Jordan has provided sufficient evidence to create a dispute of material fact regarding her claim of retaliation.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 21) is GRANTED IN PART solely as to Plaintiff's claim for failure to accommodate her request for a period of entirely remote work. The Motions submitted by both parties are otherwise DENIED.

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
September 7, 2023